Erik A. Christiansen (Utah State Bar No. 7372)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
echristiansen@parsonsbehle.com

Louis C. Schwartz (Georgia Bar No. 631057) (*pro hac vice* application forthcoming)
SCHWARTZ & ASSOCIATES, P.C.
81 East Andrews Drive
Atlanta, Georgia 30305
Telephone: (404) 545-1547
lou.schwartz@snalawyers.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| PARKER LaCHANCE, individually and on behalf of all others similarly situated, and derivatively on behalf of TRUGOLF HOLDINGS, INC., <br>    *Plaintiff,* <br> v. <br> TRUGOLF HOLDINGS, INC.; CHRISTOPHER JONES; B. SHAUN LIMBERS; HUMPHREY P. POLANEN; RILEY RUSSELL; AJ REDMER; HAYNIE & COMPANY; SANDTRAP OPPORTUNITIES LLC; ATW OPPORTUNITIES MASTER FUND II, L.P.; ATW PARTNERS OPPORTUNITIES MANAGEMENT, LLC; KERRY PROPPER; and ANTONIO RUIZ-GIMENEZ, <br>    *Defendants,* <br> and <br> TRUGOLF HOLDINGS, INC., a Nevada corporation, <br>    *Nominal Defendant.* | **CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY DEMANDED** <br><br> Case No. 2:26-cv-695 |

Plaintiff Parker LaChance ("Plaintiff"), a resident of Maine, brings this combined class and derivative action individually and on behalf of all others similarly situated (in that capacity, "Class Plaintiff"), and derivatively in the right and for the benefit of TruGolf Holdings, Inc. ("TruGolf" or the "Company") (in that capacity, "Derivative Plaintiff"), by and through his undersigned counsel, and alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation of counsel, which included review of the Company's filings with the United States Securities and Exchange Commission ("SEC"), press releases, Nasdaq notices, transfer-agent and market data, analyst and media reports, and other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a combined securities class action and shareholder derivative action arising from a convertible preferred financing whose foreseeable and actual operation transferred substantially all of the equity value of TruGolf, a Nasdaq-listed golf technology company with $18.9 million of annual revenue, from its public Class A stockholders to a small group of preferred investors. During the same period, founder insiders retained disproportionate voting power through super-voting Class B shares, and Defendant Christopher Jones separately remained a $2.25 million direct and indirect insider creditor. The challenged structure created two distinct sources of non-ratable leverage. The preferred investors could convert and resell at resetting prices, while Jones retained a $2.25 million related-party creditor position that placed him in a materially different position from public Class A stockholders in any future restructuring. TruGolf's registration statements,

proxy statements, and periodic reports materially misdescribed the scale, immediacy, and consequences of the dilution inflicted on the public float.

2. In April 2025, TruGolf's board approved agreements exchanging previously issued PIPE warrants and notes for a newly created Series A Convertible Preferred Stock (the "Series A Preferred") convertible into Class A common stock at floating, ratcheting conversion prices: as conversions and resales pressured the market price of the Class A shares downward, the conversion price reset downward, entitling the holders to still more shares. In June 2025, the Company registered for resale up to 420,825,000 shares of Class A common stock issuable upon conversion, more than ten times the approximately 40.5 million Class A shares then outstanding.

3. What followed was arithmetically foreseeable, and it was known to the persons who designed, approved, and administered the financing. Continuous conversion and resale drove the price of TRUG Class A shares down more than 98% on a split-adjusted basis; forced two reverse stock splits, 1-for-50 in June 2025 and 1-for-10 in March 2026, to maintain listing compliance; more than doubled the Class A share count in under five months; and left the Company with a market capitalization of approximately $1.6 million and stockholders' equity of $2,508,089, a margin of $8,089, or three-tenths of one percent, above the minimum required for continued Nasdaq listing. At the same time, TruGolf carried $2.25 million in current obligations to Jones and a trust he indirectly controlled, an amount exceeding the Company's approximate public equity value, while operating under a Nasdaq Mandatory Panel Monitor under which any new deficiency triggers expedited delisting.

4. Throughout, Defendants' public disclosures framed this dilution as a hypothetical future risk. The Company's November 2025 shelf registration statement told investors that TruGolf was "unable to quantify the maximum number of shares of Class A common stock issuable upon

conversion of the Series A Preferred Stock," even as management was receiving, processing, and settling conversion notices whose dilutive trajectory it knew in real time, conversion by conversion, because the Certificate of Designations required each conversion to be effected by written notice delivered to the Company.

5. The Company's own filings establish, on three separate occasions, the unreliability of Defendants' capital-structure disclosures. First, on April 17, 2026, just two days after filing its fiscal 2025 annual report, the Company amended the report solely to correct the number of its Class A shares outstanding. The signed original had overstated that figure by 480,504 shares, or approximately 52%. Second, the Company's Q1 2026 Form 10-Q contains irreconcilable figures for the number of Class A shares outstanding as of December 31, 2025. The balance sheet reports 422,899 shares, consistent with the fiscal 2025 Form 10-K, while management's discussion states that the count "was reduced from 5,355,626 to approximately 535,563" following the 2026 reverse stock split. The Company offers no explanation for the discrepancy between 535,563 shares and the 422,899 shares reported on its own balance sheet. Third, the Company reported conflicting Class A share counts for the same May 7, 2025 record date. Its May 19, 2025 definitive proxy statement reported 31,417,124 shares, while its June 3, 2025 Form 8-K reporting the voting results identified 35,650,201 shares, an unexplained discrepancy of more than 4.2 million shares. These repeated contradictions show that TruGolf lacked reliable controls over the most basic element of its capital structure and call into question every dilution, ownership, voting, and financial disclosure that depended on those share counts.

6. These disclosure failures were not isolated misfortunes; they were the conditions under which the financing operated. The ratcheting Conversion Price, Alternate Conversion Price, recapitalization resets, and approval of issuance without regard to contractual limitations benefited

the preferred investors, who could convert and resell at successive discounts. The insider benefit was not immunity from every form of dilution. It consisted of continued disproportionate voting leverage, continued authority over TruGolf's capital structure, and, for Jones, preservation of a $2.25 million direct and indirect insider-creditor position after the public Class A holders absorbed the immediate market loss, reverse-split burden, and delisting risk. Public Class A holders were the constituency least able to protect themselves and the last to receive a coherent account of the financing's actual operation.

7. The Class Plaintiff asserts strict-liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 against the Company, its Chief Executive Officer and then-interim Chief Financial Officer Christopher Jones, the directors who signed the registration statements, and the Company's auditor, Haynie & Company; claims under Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 against the Company and its insiders for materially misleading proxy solicitations; and fraud claims under Section 10(b) of the Exchange Act and Rule 10b-5 against the Company and Jones. The Derivative Plaintiff asserts claims for breach of fiduciary duty against the Company's officers and directors under the law of Delaware, the Company's state of incorporation at the time of the challenged conduct, aiding and abetting claims against the SandTrap/ATW investor defendants, and unjust enrichment in the alternative.

8. Plaintiff's claims are deliberately confined to what the record supports. Plaintiff does not assert any claim under Section 15(a)(1) of the Exchange Act, Section 29(b) of the Exchange Act, Regulation SHO, Rule 10b-21, Section 12(a)(1) of the Securities Act, Section 13(d) of the Exchange Act, Section 16(b) of the Exchange Act, or the Racketeer Influenced and Corrupt Organizations Act, and no allegation herein should be construed to assert aiding and abetting

liability under the federal securities laws. No federal securities claim of any kind is asserted against the ATW Defendants defined below.

## II. JURISDICTION AND VENUE

9. The claims asserted herein arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o; Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5, 240.14a-9; and the statutory and common law of Delaware and Nevada.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims form part of the same case or controversy.

11. Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). TruGolf maintains its principal executive offices at 60 North 1400 West, Centerville, Utah 84014, within this District, and a substantial part of the events and omissions giving rise to the claims, including the preparation, signing, and dissemination of the misleading registration statements, proxy statements, and periodic reports, occurred in this District. Defendant Haynie & Company resides and maintains its offices in Salt Lake City, Salt Lake County, Utah, within this District, and the audits and consents at issue in Count I were performed and given there.

12. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiff

13. Class Plaintiff Parker LaChance purchased TruGolf Class A common stock during the Class Period defined below, in shares issued upon or traceable to the Registration Statements defined below, as set forth in the certification filed herewith pursuant to 15 U.S.C. §§ 77z-1(a)(2) and 78u-4(a)(2), and was damaged thereby.

14. Derivative Plaintiff Parker LaChance has been a holder of TruGolf Class A common stock continuously since a date prior to April 21, 2025, including at the time of the April 2025 Exchange Agreements complained of herein (entered into on or about April 21, 2025, as reported on the Company's Form 8-K filed April 23, 2025), has held his shares continuously at all times since, will retain shares throughout the pendency of this action, and will fairly and adequately represent the interests of the Company and its shareholders in enforcing the rights of the Company. Fed. R. Civ. P. 23.1. A verification of Plaintiff accompanies this Complaint.

### B. Nominal Defendant

15. Nominal Defendant TruGolf Holdings, Inc. is a corporation organized under the laws of Nevada, with its principal executive offices at 60 North 1400 West, Centerville, Utah 84014 (telephone (801) 298-1997). TruGolf was incorporated in Delaware at all times relevant to the challenged transactions and converted to a Nevada corporation effective March 10, 2026. Its Class A common stock trades on the Nasdaq Capital Market under the symbol "TRUG." The Company's SEC Central Index Key is 1857086.

### C. Individual Defendants

16. Defendant Christopher Jones ("Jones") is, and was at all relevant times, TruGolf's Chief Executive Officer, President, and a director, and served as the Company's interim Chief

7

Financial Officer and principal financial and accounting officer until May 15, 2026. Jones signed the Form S-1 registration statement (June 20, 2025), the Form S-3 registration statement (signed November 17, 2025, filed November 18, 2025), and the fiscal 2025 Form 10-K (April 15, 2026) and the amendments thereto, in each instance in the dual capacity of Principal Executive Officer and Interim Principal Financial Officer and Interim Principal Accounting Officer, as stated on each signature page, and signed the certifications required by Sections 302 and 906 of the Sarbanes-Oxley Act accompanying the Company's annual and quarterly reports in both capacities. Jones beneficially owns 10,089 shares of Class B common stock carrying twenty-five votes per share, representing approximately 18.4% of the Company's total voting power individually.

17. Defendants Humphrey P. Polanen, Riley Russell, and AJ Redmer are, and were at relevant times, directors of TruGolf, and constituted the Company's audit committee (Polanen, chair). Each of Polanen, Russell, and Redmer signed both the S-1 Registration Statement (June 20, 2025) and the S-3 Registration Statement (November 17, 2025), and the fiscal 2025 Form 10-K (April 15, 2026). As audit committee members, they were charged under the Company's own governance documents and Nasdaq listing rules with oversight of the Company's financial reporting and internal controls, including the capital-structure records whose failures are alleged herein.

18. Defendant B. Shaun Limbers ("Limbers") was a director of TruGolf at all times from before the April 2025 Exchange Agreements until his resignation on March 16, 2026, participated in the board's approval of the challenged transactions, and signed both the S-1 Registration Statement and the S-3 Registration Statement. Limbers is named as a defendant in Counts I, III, and VI.

19. Jones, Limbers, Polanen, Russell, and Redmer are referred to collectively as the "Individual Defendants." Limbers, Polanen, Russell, and Redmer are referred to as the "Director Defendants." The Individual Defendants who signed one or both Registration Statements, that is, all of them, are referred to as the "Signing Defendants."

## D. Auditor Defendant

20. Defendant Haynie & Company ("Haynie") is a certified public accounting firm headquartered in Salt Lake City, Utah (PCAOB Firm ID No. 457). Haynie has served as TruGolf's independent registered public accounting firm since 2024, audited the Company's financial statements incorporated in the Registration Statements, and consented to the inclusion of its audit reports therein. Haynie is named in Count I solely with respect to the portions of the Registration Statements it expertised.

## E. The ATW Defendants

21. Defendant SandTrap Opportunities LLC ("SandTrap") is a Delaware limited liability company and, per the Company's S-1 selling-securityholder disclosures, a wholly owned special purpose vehicle of Defendant ATW Opportunities Master Fund II, L.P. (the "Fund"). Defendant ATW Partners Opportunities Management, LLC serves as the investment manager to the Fund. Defendants Kerry Propper and Antonio Ruiz-Giménez are the managing members and control persons of the investment manager. These defendants (the "ATW Defendants") maintain their principal places of business c/o ATW Partners Opportunities Management, LLC, One Pennsylvania Plaza, Floor 48, Suite 4810, New York, New York 10119, hold the Series A Preferred, and jointly filed a Schedule 13G on February 4, 2026 reporting beneficial ownership of 539,133 shares of Class A common stock (9.9%). The ATW Defendants are named only in Counts VII and VIII; no claim under the federal securities laws is asserted against them.

9

## IV. SUBSTANTIVE ALLEGATIONS

### A. The Company and Its Dual-Class Structure

22. TruGolf develops golf-simulation hardware and software. It became a public company on January 31, 2024 through a business combination with Deep Medicine Acquisition Corp. ("DMAQ"), a special purpose acquisition company (Agreement and Plan of Merger dated July 21, 2023, as amended December 7, 2023, among DMAQ, DMAC Merger Sub Inc., Bright Vision Sponsor LLC, Christopher Jones as Seller Representative, and TruGolf, Inc.; closing reported on Form 8-K filed February 6, 2024). In connection therewith, pursuant to a Securities Purchase Agreement dated February 2, 2024 (reported on Form 8-K filed February 7, 2024), the Company issued senior convertible PIPE notes in an aggregate principal amount of up to $15,500,000 (issued at a 10% original issue discount, with an initial conversion price of $10.00 per share subject to downward adjustment), Series A Warrants to purchase 1,409,091 Class A shares, and Series B Warrants to purchase 1,550,000 Class A shares, to certain investors, including predecessors-in-interest of the ATW Defendants.

23. At all relevant times, TruGolf has had a dual-class structure: Class A common stock carrying one vote per share, and Class B common stock, held by founders and insiders including Jones, carrying twenty-five votes per share. Per the Company's definitive proxy statement filed May 19, 2025, as of the May 7, 2025 record date for the May 30, 2025 special vote described below, there were 31,417,124 Class A shares outstanding (one vote each) and 9,999,999 Class B shares outstanding (249,999,975 votes), giving the Class B holders approximately 88.8% of the Company's total voting power. The Company's Form 8-K reporting the vote results stated that 35,650,201 Class A shares were outstanding as of the same record date, an unexplained discrepancy of more than 4.2 million shares with the proxy statement, alleged herein as evidence

10

of the unreliability of the Company's capital-structure records. As of the January 20, 2026 record date for the February 17, 2026 annual meeting, Class B holders controlled approximately 50.7% of total voting power (4,999,975 of 9,857,420 votes).

24. As of March 31, 2026, TruGolf reported $2.25 million in current related-party notes payable to Jones and ARJ Trust, a trust indirectly controlled by Jones, per the Company's Q1 2026 Form 10-Q. The total consisted of a $1.6 million direct loan from Jones and two ARJ Trust notes with an aggregate principal balance of $650,000.

25. Jones originally loaned TruGolf $2 million during 2024 for operating expenses. The Company disclosed that the loan bore no interest and had no stated maturity, and that TruGolf repaid $400,000 of principal during 2025. The ARJ Trust notes bore interest at 8.5% and had amended maturity dates of September 30, 2026. Jones therefore occupied four positions simultaneously: chief executive officer, director, significant Class B voting holder, and the source or indirect controller of creditor claims exceeding the Company's approximate public equity value.

26. In a written response dated April 29, 2026, transmitted through its counsel to counsel for a TruGolf shareholder other than Plaintiff, the Company stated that Jones previously converted $1.9 million of additional debt into common stock. The May 19, 2025 proxy materials separately disclosed that approximately $4 million of dividend-related promissory notes payable to certain stockholders were to be converted into restricted common stock or Class B common stock, subject to as much as $750,000 remaining outstanding. These facts establish that insider debt-for-equity recapitalization was not hypothetical in TruGolf's capital history.

27. The public filings do not disclose that the remaining Jones loan or ARJ Trust notes contain a unilateral contractual conversion right. The conflict instead arises from Jones's simultaneous service as officer, director, voting stockholder, and creditor, together with the

Company's demonstrated use of insider debt exchanges. Illustratively, if TruGolf's pre-exchange public equity value were $1 million and $2.25 million of Jones and ARJ Trust claims were exchanged for an equal value of equity, those claims would represent approximately 69.2% of the resulting economic equity before accounting for the issuance price, the class of stock issued, voting terms, Nasdaq requirements, and independent-board approval. This continuing optionality supplied Jones with a potential non-ratable control-restoration benefit after public holders bore the first-stage dilution.

## B.  The April 2025 Series A Preferred Transaction

28.  On or about April 21, 2025 (as reported on the Company's Form 8-K filed April 23, 2025, EDGAR Accession No. 0001641172-25-005787), the Company entered into Exchange Agreements with the holders of the PIPE Convertible Notes and PIPE Warrants issued under the February 2, 2024 Securities Purchase Agreement, counterparties subsequently identified in the Company's S-1 selling-securityholder disclosures as including the ATW Defendants, pursuant to which holders of the Company's Series A and Series B PIPE warrants exchanged those instruments for 1,885 shares of newly designated Series A Preferred and warrants to purchase 37,033 additional shares of Series A Preferred at an exercise price of $900 per preferred share, pursuant to Section 3(a)(9) of the Securities Act. In July 2025, the remaining $3,938,311 of PIPE note principal was exchanged for 3,938 additional shares of Series A Preferred.

29.  The Certificate of Designations of Rights and Preferences of Series A Convertible Preferred Stock, filed as Exhibit 10.2 to the Company's Form 8-K filed April 23, 2025 (the "Certificate of Designations"), provided for 10% dividends, seniority, and conversion into Class A common stock at a price subject to downward adjustment, including an Alternate Conversion Price and recapitalization reset provisions. Section 4(d)(i) established 4.99% as the default

12

"Maximum Percentage" applicable to each holder of Series A Preferred (each, a "Holder"). A Holder could increase that limitation to no more than 9.99% only by delivering written notice to TruGolf, and any increase became effective on the sixty-first day after delivery. TruGolf was prohibited from effecting a conversion exceeding the operative Maximum Percentage, and any excess shares were contractually null and void ab initio. Each conversion was separately effected by a written Conversion Notice delivered to the Company, which then issued the conversion shares. TruGolf and the responsible officers therefore possessed direct, contemporaneous knowledge of both the individualized ownership limitation and every conversion processed under it.

30. The economic substance of these terms was a self-adjusting claim on an ever-increasing number of Class A shares: as conversions and sales pressured the market price downward, the conversion price reset downward, entitling the holders to still more shares. This structure, and its foreseeable operation, was known to the Company's board and to the ATW Defendants when it was approved, because they negotiated it. By December 31, 2025, the conversion price had ratcheted down to $2.16 per share (pre-split; $21.60 as adjusted for the March 2026 reverse split), and 5,427 shares of Series A Preferred remained outstanding. On or about April 22, 2026, following the second reverse stock split, the reset provisions operated again, reducing the conversion price from $21.60 to $2.76 per share, as reflected in the Company's Q1 2026 Form 10-Q, a further reduction of approximately 87% that increased nearly eightfold the number of Class A shares issuable per share of remaining Series A Preferred.

31. The Certificate of Designations further provided, as reproduced in the Company's own proxy materials and later described in its Q1 2026 Form 10-Q, that upon conversion each holder receives, in addition to the Stated Value and accrued dividends, a "Make-Whole Amount" equal

to all dividends that would otherwise have accrued on the converted Series A Preferred through the five-year anniversary of issuance, convertible into Class A common stock at the "Alternate Conversion Price," defined as the lesser of the conversion price and 90% of the lowest volume-weighted average price of the Class A common stock during the five consecutive trading days preceding conversion. At the 10% dividend rate, the five-year Make-Whole Amount approximates an additional one-half of Stated Value per converted share, delivered in discounted stock. The Certificate of Designations also established a penalty architecture: upon the occurrence and during the continuance of any of twenty-one enumerated "Triggering Events," including registration-statement filing and effectiveness deadline failures and the Company's failure to maintain an authorized-share reserve of 200% of the shares issuable upon full conversion at the Floor Price, the dividend rate automatically increases to a "Default Rate" of 15% per annum for cash payment or 18% per annum for payment in shares, and each holder receives an "Alternate Conversion Right Period" during which conversions may be effected at the Alternate Conversion Price, running until ten trading days after the later of cure and the holder's receipt of a compliant Triggering Event Notice from the Company.

32. Under the Registration Rights Agreement executed with the Exchange Agreements, the Company was required to file the resale registration statement within fifteen calendar days after the Stockholder Approval Date, and Section 5(a)(i) of the Certificate of Designations made the failure to file within five days after that deadline a Triggering Event. Stockholder approval was obtained May 30, 2025; the Filing Deadline was accordingly June 14, 2025, and the Triggering Event date June 19, 2025. The Company filed the S-1 on June 20, 2025. On the face of the public record, a Triggering Event under Section 5(a)(i) therefore occurred, with the attendant Default Rate and Alternate Conversion Right consequences. No TruGolf filing has ever disclosed the

14

occurrence of any Triggering Event, the delivery of any Triggering Event Notice, or the accrual of dividends at the Default Rate, and upon information and belief, based on the absence of any such disclosure in any Company filing, no compliant Triggering Event Notice was delivered, with the consequence that the resulting Alternate Conversion Right Period did not close by its terms.

33.   Section 11(a) of the Certificate of Designations required the Company to reserve at least 150% of the shares necessary to convert all outstanding Series A Preferred at the Floor Price. At issuance, conversion of the 1,885 Series A Preferred at the $0.07 Floor Price required approximately 26.9 million Class A shares. The Required Reserve Amount was therefore approximately 40.4 million shares, consuming approximately 82% of the approximately 49.5 million authorized-but-unissued Class A shares then available. Although the May 19, 2025 Proxy Statement reproduced the reserve provisions, it did not quantify that extraordinary consumption of the Company's remaining authorized capacity or explain that the reserve left only approximately 9.1 million authorized shares available before accounting for dividends, make-whole obligations, or other issuances.

**C.  The May 30, 2025 Shareholder Approval, Carried by the Insiders' Own Votes**

34.   Because the Series A Preferred was convertible into more than 20% of the Company's outstanding common stock at prices below the Nasdaq "Minimum Price," Nasdaq Listing Rule 5635(d) conditioned the issuance on shareholder approval. By definitive proxy statement filed May 19, 2025 (EDGAR Accession No. 0001641172-25-011501), the Company solicited, and at a special meeting held May 30, 2025 obtained, approval of Proposal 1 thereof: "To approve, for purposes of complying with Nasdaq Listing Rule 5635(d), our issuance of all of the shares of our Class A common stock upon conversion of the Company's Series A Preferred Stock, without regard to any limitations on conversion . . . and assuming all Series A Convertible Preferred

15

Warrants . . . have been issued and exercised." Per the Company's Form 8-K filed June 3, 2025 (Item 5.07), Proposal 1 carried by 260,683,188 votes For, 1,124,928 Against, and 21,499 Abstentions. The same meeting approved a reverse-split authorization (Proposal 2) and an increase in authorized Class A shares from 90,000,000 to 650,000,000 (Proposal 3).

35. The May 30, 2025 approval was not a decision of the public stockholders whose economic and voting interests it would materially dilute. It was carried by the super-voting Class B shares held by insiders, including Jones: the Class B shares alone commanded 249,999,975 votes, approximately 96% of the 260,683,188 For votes on Proposal 1, such that the outcome did not depend on the Class A vote in any respect. The approval was not conditioned on, and did not receive, approval by a majority of the votes of disinterested stockholders, and the proxy materials soliciting it did not disclose the then-known trajectory and scale of the dilution the approval would enable, as alleged in Section IV.H below. The Class B holders thus supplied approximately 96% of the votes cast in favor of authorizing issuance, "without regard to any limitations," of more than ten times the public Class A float. Public Class A holders bore the immediate economic consequences, while the Class B holders retained disproportionate voting leverage.

**D. The Registration of 420,825,000 Shares and the Dilution Machine in Operation**

36. On June 20, 2025, the Company filed a registration statement on Form S-1 (EDGAR Accession No. 0001641172-25-015916) registering up to 420,825,000 shares of Class A common stock issuable upon conversion of the Series A Preferred (including preferred issuable on exercise of the preferred warrants), more than ten times the 40,532,790 Class A shares then outstanding. The S-1 was declared effective on September 10, 2025, and a prospectus was filed pursuant to Rule 424(b)(3) (together with all amendments and documents incorporated by reference, the "S-1 Registration Statement").

37. The June 2025 reverse split addressed a Nasdaq bid-price deficiency that predated the effectiveness of the S-1 Registration Statement. Plaintiff does not allege that the Series A conversion cycle caused that first split. Its timing is relevant because it reduced the public float immediately before the resale registration became effective and the later conversion cycle accelerated.

38. On November 18, 2025, the Company filed a registration statement on Form S-3 (EDGAR Accession No. 0001493152-25-023954) registering up to $200 million of securities, declared effective December 15, 2025 (the "S-3 Registration Statement" and, with the S-1 Registration Statement, the "Registration Statements"). The S-3 Registration Statement stated that the Company "is unable to quantify the maximum number of shares of Class A common stock issuable upon conversion of the Series A Preferred Stock."

39. Conversions proceeded continuously. The Company's Class A share count, as adjusted for both reverse splits, grew from the 422,899 shares reported at December 31, 2025 to 914,267 shares at April 15, 2026, and to 1,093,687 shares at May 15, 2026, an increase over that period of approximately 159%, driven by Series A conversions. The 422,899 figure for December 31, 2025 appears on the balance sheets of both the fiscal 2025 Form 10-K and the Q1 2026 Form 10-Q, yet the Q1 2026 Form 10-Q is internally irreconcilable as to that same date: its management's discussion states that the number of Class A shares outstanding at December 31, 2025 "was reduced from 5,355,626 to approximately 535,563" as a result of the 2026 reverse stock split, a figure that cannot be reconciled with the 422,899 shares reported on that same report's balance sheet, and that is alleged herein as further evidence of the unreliability of the Company's capital-structure reporting. During fiscal 2025, the Company recorded $4,693,111 of preferred dividends

17

converted to Class A shares, $3,213,000 of PIPE note principal converted, and a $6,135,160 loss on extinguishment.

40. On March 27, 2026, the Company effected a second reverse stock split, 1-for-10, to maintain compliance with Nasdaq's minimum price requirement. On a split-adjusted basis, TRUG Class A shares declined from a split-adjusted trailing-year high above $85 to approximately $1.45 by mid-June 2026, a decline of more than 98%, leaving the Company with a market capitalization of approximately $1.6 million, less than one tenth of its annual revenue.

**E. The Nasdaq Listing Crisis and the $8,089 Margin**

41. The Company regained compliance with Nasdaq's continued-listing requirements on August 1, 2025 only after a hearings-panel process, and was placed under a Nasdaq Mandatory Panel Monitor through August 2026, pursuant to which any new deficiency under the stockholders'-equity rule would result in an expedited delisting determination. At March 31, 2026, the Company reported stockholders' equity of $2,508,089, exactly $8,089 above the $2.5 million minimum. The margin between continued listing and expedited delisting, for a company whose financing depended on a listed, liquid Class A market into which conversion shares could be sold, was three-tenths of one percent.

42. On January 5, 2026, Nasdaq notified the Company of a separate deficiency for failure to hold an annual meeting within twelve months of its fiscal year end (Listing Rules 5620(a), 5810(c)(2)(G)), disclosed on Form 8-K on January 9, 2026 and cured by the February 17, 2026 annual meeting. The Company thus spent the Class Period in continuous proximity to delisting on two independent grounds, a condition its disclosures never presented with the immediacy the facts possessed.

**F.  The ATW Schedule 13G**

43.  On February 4, 2026, the ATW Defendants filed a Schedule 13G (event date January 29, 2026) pursuant to Rule 13d-1(c), certifying that their TruGolf securities were not acquired or held "with the purpose or effect of changing or influencing the control of the issuer," and reporting shared voting and dispositive power over 539,133 Class A shares (9.9%), representing shares acquirable within sixty days upon conversion of Series A Preferred subject to the 9.99% blocker. The ATW Defendants have filed no Schedule 13D and no amendment since. This filing is alleged as context for the ATW Defendants' knowledge and course of conduct; no claim under Section 13(d) or any other federal securities provision is asserted against them.

44.  The 9.99% limitation described in the Schedule 13G was not the Certificate's default Maximum Percentage. Under Section 4(d)(i), the default was 4.99%; an increase required a Holder-specific written notice to TruGolf and did not become effective until the sixty-first day after delivery. The notice therefore constituted a discrete, dated document known to both SandTrap, as the Holder, and TruGolf, as the required recipient.

45.  The 539,133 shares reported in the Schedule 13G corresponded almost exactly to the 9.99% ceiling when applied to the 4,857,445 outstanding shares used in the filing. By contrast, the default 4.99% limitation permitted acquisition of only approximately 255,117 shares under the same denominator. The Schedule 13G thus claimed a right to acquire more than twice the number of shares permitted under the Certificate's default limitation.

46.  Because an increase did not become effective until the sixty-first day after notice, the Schedule 13G's January 29, 2026 event date and representation that SandTrap could acquire the reported shares within sixty days presupposed delivery of the written increase notice no later than

January 28, 2026. Neither the Schedule 13G nor any identified TruGolf filing disclosed the notice, its delivery date, or its effective date.

47. The discrepancy admits of two materially different explanations. If SandTrap did not deliver timely written notice, its representation that it had the right to acquire 539,133 shares within sixty days was inconsistent with the binding 4.99% limitation. If SandTrap did deliver the notice, TruGolf necessarily possessed contemporaneous written evidence that SandTrap's conversion capacity had doubled. In either event, the missing notice and its date were material to evaluating the accuracy of the ownership, convertibility, dilution, and capital-structure disclosures alleged herein.

48. By April 30, 2026, TruGolf possessed the conversion notices, preferred-share balances, blocker notices, and transfer records necessary to determine ATW's then-current beneficial ownership. The Form 10-K/A affirmatively represented that the ownership table identified each person known by the Company to own more than 5%, yet it omitted the ATW reporting persons and did not reconcile that omission with the still-unamended Schedule 13G reporting 9.9% ownership.

## G. The 10-K, the Share-Count Correction, the Late 10-Q, and the Company's Broken Records

49. On April 15, 2026, the Company filed its fiscal 2025 Form 10-K, signed by Jones as both principal executive officer and interim principal financial and accounting officer, and by directors Polanen, Russell, and Redmer, among others. It reported revenue of $18.9 million (down from $21.3 million in fiscal 2024) and a net loss of $15,227,893, and incorporated Haynie's audit report dated April 15, 2026.

50. Two days later, on April 17, 2026, the Company filed Amendment No. 1 to the 10-K for the sole purpose of correcting the cover-page statement of its own Class A shares outstanding

20

as of April 15, 2026: from 1,394,771 shares to 914,267 shares, an overstatement of 480,504 shares, or approximately 52%. The correction is the Company's own admission, in its own signed filing, that the flagship disclosure document of its fiscal year misstated the single most basic fact about its capital structure by more than half. On April 30, 2026, the Company filed Amendment No. 2 to add Part III information, because it would not file a proxy statement within 120 days of fiscal year end.

51. On April 16, 2026, counsel for a TruGolf shareholder other than Plaintiff transmitted by email to Jones and the members of TruGolf's board of directors a written notice specifically challenging the reliability of the Company's capital-structure disclosures, the extraordinary increase in outstanding Class A shares, and the accuracy and implications of the ATW reporting persons' Schedule 13G. Less than forty-eight hours later, at 12:32 p.m. Eastern Time on April 17, 2026, TruGolf filed Amendment No. 1 to its Form 10-K, signed by Jones, acknowledging that the original Form 10-K had overstated the number of outstanding Class A shares by 480,504 shares, or approximately 52%. Plaintiff does not allege, absent discovery, that the shareholder notice caused the amendment. The chronology is alleged as circumstantial evidence that Jones and the board had contemporaneous written notice that TruGolf's capital-structure reporting was under specific challenge.

52. On May 6, 2026, the Company announced the appointment of Steven Passey as Chief Financial Officer effective May 15, 2026, the Company's first non-interim Chief Financial Officer during the entire period in which the misstatements alleged herein were made. On May 15, 2026, the Company filed a Form 12b-25 notification of late filing for its Q1 2026 Form 10-Q, which it filed on May 20, 2026. For more than a year, while executing one of the most dilution-intensive

financings on the Nasdaq, the Company's financial reporting function was run on an interim basis by its Chief Executive Officer.

53. The Company's governance arrangements compounded the absence of independent oversight. On March 16, 2026, the same day Limbers resigned from the board, the board appointed Brenner Adams, until that day the Company's Chief Growth Officer, as a director; Adams simultaneously resigned his officer position, assumed the chairmanship previously held by Jones, and, per the Company's own disclosure, serves on no committee of the board. The Company accordingly entered the period of its most consequential corrective disclosures, the April 2026 amendments and the late first-quarter report, with a five-member board whose chairman had been a member of management three weeks earlier, whose chief executive simultaneously served as principal financial and accounting officer, and whose share and record-date counts, as alleged above, could not be reconciled across its own filings.

## H.  Materially False and Misleading Statements and Omissions

54. The Registration Statements, the definitive proxy statements filed May 19, 2025 and January 26, 2026 soliciting the May 30, 2025 and February 17, 2026 votes (the "Proxy Statements"), and the Company's periodic reports during the Class Period were materially false and misleading, and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, in at least the following respects:

55. (a) They presented conversion-driven dilution as a contingent, hypothetical future risk, including through risk-factor language warning that conversions "could" or "may" dilute existing holders, when, in fact, massive dilution was occurring continuously and its near-term trajectory was known to management in real time through the conversion notices received, processed, and settled by the Company under the Certificate of Designations. Those statements

22

were misleading because they described dilution as a future possibility after the Company had received and settled conversion notices establishing that substantial dilution was already occurring.

56. (b)  They failed to disclose, as required by Item 303 of Regulation S-K, 17 C.F.R. § 229.303, the known trend and uncertainty that conversions at ratcheting discounts would continue to multiply the public float and depress the price of the Class A shares, and, as required by Item 105 of Regulation S-K, 17 C.F.R. § 229.105, the specific magnitude and probability of that dilution as it was actually being experienced.

57. (c)  The statement that TruGolf was "unable to quantify the maximum number of shares of Class A common stock issuable upon conversion of the Series A Preferred Stock" was materially misleading in context. Future market prices, dividends, and make-whole adjustments may have prevented calculation of a permanent maximum. But TruGolf possessed and could have disclosed the number of conversion shares already issued, the remaining Stated Value, accrued dividends, the then-effective Conversion Price, the required share reserve, the conversion notices then in hand, and price-sensitive issuance ranges at representative market prices. The statement presented the absence of a permanent fixed ceiling as an inability to quantify the then-current issuance exposure that management was measuring and administering in real time.

58. (d)  The Company materially misstated its capitalization when its April 15, 2026 Form 10-K overstated the number of outstanding Class A shares by 480,504 shares, or approximately 52%, as admitted by the corrective amendment filed two days later. The Company also reported irreconcilable figures for December 31, 2025 and May 7, 2025. At least one figure in each pair was necessarily inaccurate. Those contradictions further establish the unreliability of the Company's capital-structure controls. Plaintiff will identify the correct figures through the Company's stock ledger and transfer-agent records.

59. (e) The proxy materials soliciting the May 30, 2025 approval failed to disclose the then-known scale and consequences of the issuance being authorized "without regard to any limitations," including its foreseeable effect on the Company's listing compliance and the disparate consequences for Class A holders as against the super-voting Class B insiders soliciting the vote, and without quantifying that the Required Reserve Amount would consume approximately 82% of the Company's remaining authorized Class A capacity; and the proxy materials soliciting the February 17, 2026 votes failed to disclose the true, then-current state of the Company's capital structure, as evidenced by the irreconcilable share counts alleged above.

60. The April 30, 2026 Form 10-K/A ownership disclosure was materially misleading for the additional reason alleged in Paragraph 48. Jones signed a filing that represented that TruGolf had identified each known greater-than-5% beneficial owner and had counted securities convertible within sixty days subject to applicable blockers, while omitting the ATW reporting persons whose unamended Schedule 13G reported 9.9%. The omission was not a pure omission untethered to a statement by TruGolf; it rendered TruGolf's affirmative description of the scope and methodology of its ownership table misleading. By April 29, 2026, TruGolf, through its counsel, had responded in writing to the April 16 shareholder notice, eliminating any inference that Jones and the board had not received and reviewed it. Nevertheless, on April 30, 2026, Jones signed Amendment No. 2, which purported to identify every person known by TruGolf to beneficially own more than 5% while omitting the ATW reporting persons identified in the still-operative Schedule 13G.

61. (f) The Registration Statements and periodic reports failed to disclose the penalty and make-whole architecture of the Series A Preferred and its actual operation: the fiscal 2025 Form 10-K contains no reference to any Triggering Event, to the Default Rate, or to the Floor Price; the

five-year dividend Make-Whole Amount, approximating an additional one-half of Stated Value per converted share delivered in discounted stock, was never quantified in any dilution disclosure; and the Company's own dilution tables excluded make-whole shares in every period as "undeterminable" based on "variable floating factors," when the actual make-whole shares delivered on each completed conversion were calculable once the conversion-date inputs were known, and the aggregate number of shares already issued was available from the Company's conversion and transfer records. The fiscal 2025 Form 10-K separately discloses that during 2025 the Company converted $1,082,194 of make-whole interest on the PIPE Convertible Notes into Class A shares at an Alternate Conversion Price, confirming that make-whole conversion mechanics were operating in fact while remaining undisclosed in operational or quantified terms.

62. Each statement and omission alleged above is identified by document, date, and content in Sections IV.A through IV.G, and each was material: a reasonable investor deciding whether to purchase TRUG Class A shares, or how to vote them, would have regarded the true velocity and scale of the ongoing dilution, and the unreliability of the Company's own share records, as significantly altering the total mix of available information.

## I.  Additional Scienter Allegations (Counts IV and V Only)

63. Jones knew, or was deliberately reckless in not knowing, that the statements alleged above were materially misleading when made. The inference arises holistically from role, access, contradiction, motive, and subsequent correction. Role: Jones signed every operative filing in the dual capacity of principal executive officer and interim principal financial and accounting officer and signed the accompanying Sarbanes-Oxley certifications. Access: every Series A conversion required a notice delivered to TruGolf, and any increase of SandTrap's Maximum Percentage required a separate written notice delivered to TruGolf; Jones was the officer responsible for the

resulting capital-structure disclosures. Contradiction: the ATW reporting persons publicly claimed 9.9% beneficial ownership and a right to acquire 539,133 shares within sixty days, while the April 30, 2026 Form 10-K/A signed by Jones purported to identify all known greater-than-5% owners yet omitted them, one day after the Company, through counsel, had responded in writing to, and fourteen days after it had received, a written shareholder notice specifically challenging the accuracy of its capital-structure reporting and the Schedule 13G. Motive: Jones had a substantial interest in preserving TruGolf's Nasdaq listing, his continued executive authority, disproportionate Class B voting leverage, and a $2.25 million direct and indirect insider-creditor position that exceeded the Company's approximate public equity value and supplied potential recapitalization optionality. Correction and control failure: the Company repeatedly misstated its outstanding share count, corrected the fiscal 2025 Form 10-K, reported irreconcilable share counts for identical dates, filed its quarterly report late, and operated for more than a year without a dedicated chief financial officer while administering one of Nasdaq's most dilution-intensive financings. Considered together, these particularized facts support a cogent inference of deliberate recklessness at least as compelling as an inference of isolated mistake or ordinary negligence.

64. The statutory safe harbor for forward-looking statements does not protect the statements alleged herein. The misstatements concerned then-existing facts: the current share count, the conversions then occurring, and the resets then effected. To the extent any statement is deemed forward-looking, it was not accompanied by meaningful cautionary language, because the purportedly cautionary language warned of risks as hypothetical when they had already materialized and were known to have materialized, and the speakers had actual knowledge that the statements were misleading when made.

26

## J. Loss Causation (Counts IV and V Only)

65. The economic losses of Class Plaintiff and the Class were proximately caused by Defendants' misstatements and omissions, which maintained the price of TRUG Class A shares at artificially inflated levels, and which were revealed, and whose concealed risks materialized, through partial corrective disclosures and materializations including, without limitation: the successive conversion-tranche and share-count disclosures in the Company's periodic reports; the January 5 through January 9, 2026 Nasdaq deficiency disclosures; the April 17, 2026 share-count correction; and the May 20, 2026 disclosure of stockholders' equity within $8,089 of the delisting threshold. As these disclosures reached the market, the price of TRUG Class A shares declined, damaging Class members. The more than 98% split-adjusted decline of the Class A shares over the relevant period reflects, in substantial part, the materialization of the concealed risks alleged herein rather than market-wide or industry factors.

## V. CLASS ACTION ALLEGATIONS

66. Class Plaintiff brings Counts I through V on behalf of a class (the "Class") consisting of all persons who purchased or otherwise acquired TruGolf Class A common stock during the period from September 10, 2025 (the effectiveness of the S-1 Registration Statement) through May 20, 2026 (the filing of the Q1 2026 Form 10-Q), inclusive (the "Class Period"), including all persons who purchased Class A shares issued upon, or traceable to, the Registration Statements, and were damaged thereby. Excluded from the Class are Defendants; the officers and directors of the Company; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

67. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TRUG Class A shares were actively traded on the

27

Nasdaq Capital Market, with millions of shares changing hands. While the exact number of Class members is unknown to Plaintiff and can be ascertained only through appropriate discovery, Plaintiff believes the Class numbers, at a minimum, in the hundreds. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail and publication.

68. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members, including: whether the Registration Statements contained material misstatements or omissions; whether the Proxy Statements were materially false or misleading; whether the federal securities laws were violated by Defendants' conduct; whether Jones acted with scienter (Counts IV and V); and the extent and appropriate measure of damages.

69. Class Plaintiff's claims are typical of the claims of the members of the Class, all of whom were similarly damaged by Defendants' conduct, and Class Plaintiff will fairly and adequately protect the interests of the Class, having retained counsel competent and experienced in securities class-action litigation. Class Plaintiff has no interests antagonistic to, or in conflict with, those of the Class. Plaintiff is represented by independent counsel of record; no attorney for the Class is a party, a witness, or a class member.

70. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy under Fed. R. Civ. P. 23(b)(3). The interest of individual Class members in separately controlling the prosecution of individual actions is minimal, because the damages suffered by many individual members are small relative to the burden and expense of individual litigation against a company in this condition; Plaintiff is aware of no other pending litigation concerning this controversy commenced by or against members of the Class;

28

concentration of the litigation in this forum, where the Company is headquartered, where the misleading filings were prepared and signed, and where the auditor resides, is desirable; and no unusual difficulties are likely to be encountered in the management of this action as a class action, the Class being defined by objective, transfer-agent-verifiable transactions in a single Nasdaq-listed security over a defined period.

71. Notice of the pendency of this action, and of any settlement or judgment, will be provided to the proposed Class by the best notice practicable under Fed. R. Civ. P. 23(c)(2)(B), including individual notice by mail or electronic means to all members who can be identified through reasonable effort from the records of the Company, its transfer agent, and brokers and nominees, supplemented by publication. Plaintiff will additionally cause the early notice required by the Private Securities Litigation Reform Act, 15 U.S.C. §§ 77z-1(a)(3)(A) and 78u-4(a)(3)(A), to be published within 20 days of the filing of this Complaint.

72. With respect to Count IV, Class Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine and, in the alternative and as to omissions, upon the presumption of reliance applicable to material omissions; Counts I through III do not require proof of individual reliance.

### VI. DERIVATIVE AND DEMAND-FUTILITY ALLEGATIONS

73. Derivative Plaintiff brings Counts VI through VIII derivatively in the right and for the benefit of the Company. Derivative Plaintiff was a shareholder of TruGolf at the time of the transactions complained of, has been continuously since, and will retain shares through the pendency of this action. Fed. R. Civ. P. 23.1(b)(1). This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

74. Derivative Plaintiff has not made a demand on the board of directors of TruGolf to institute this action, because such a demand would be futile and is therefore excused. TruGolf is today a Nevada corporation, and Nevada law, like the Delaware law it looks to for guidance on demand futility, *see Shoen v. SAC Holding Corp.*, 122 Nev. 621, 137 P.3d 1171 (2006), excuses demand where particularized allegations create a reasonable doubt that a majority of the board could exercise independent and disinterested business judgment in responding to it. That doubt is established here director by director, as to the board as constituted at the time of filing: Jones, Humphrey P. Polanen, Riley Russell, AJ Redmer, and Brenner Adams.

75. Jones is interested and faces a substantial likelihood of liability. He signed every operative filing in dual officer capacities and certified each under the Sarbanes-Oxley Act; personally held approximately 18.4% of TruGolf's voting power; and simultaneously stood as the direct lender or indirect controller of $2.25 million in current related-party obligations. TruGolf's April 29, 2026 written response to a shareholder notice further acknowledged that Jones previously exchanged $1.9 million of additional debt for common stock. Any board investigation would therefore have to examine Jones's own disclosure decisions, his administration of the Series A conversions, the approval and repayment of his insider loan, the ARJ Trust relationship, and whether his creditor position supplied a nonratable benefit or motive. Jones is also a defendant on non-exculpated claims, including strict-liability and negligence claims under Count I and disclosure-based loyalty and good-faith claims. He cannot impartially consider a demand to investigate and sue himself or to challenge transactions affecting his own creditor interests.

76. Polanen, Russell, and Redmer each face a substantial likelihood of liability that disables impartial consideration of a demand. Each signed both Registration Statements and the fiscal 2025 Form 10-K; each is a defendant under Section 11 of the Securities Act, a claim as to

which due diligence, not exculpation, is the only defense; each served on the audit committee (Polanen as chair) charged with oversight of the financial reporting and internal controls whose failures are pleaded above and admitted by the Company's own April 17, 2026 correction; and each approved or acquiesced in the challenged transactions and the disclosures soliciting their approval. Their exposure is not merely negligence-based. On April 16, 2026, each of Polanen, Russell, and Redmer personally received, by email addressed to him individually, the written shareholder notice described above, specifically challenging the reliability of the Company's capital-structure disclosures and the accuracy of the ATW reporting persons' Schedule 13G. With that written notice in hand, none of them caused the board to undertake any disclosed investigation, form any special or independent committee, retain independent advisors, or take any other responsive action, and fourteen days later they permitted Jones to sign Amendment No. 2, which continued to omit the ATW reporting persons from the Company's ownership disclosures. Consciously declining to act on a specific written warning of ongoing disclosure violations, while permitting the challenged disclosures to continue, constitutes intentional misconduct or a knowing violation of law within the meaning of NRS 78.138(7), not mere oversight failure. That knowing inaction, together with their non-exculpable Section 11 exposure as signers of both Registration Statements and their audit-committee responsibility for the very controls whose failure the Company's own April 17, 2026 amendment admits, creates far more than a reasonable doubt as to their ability to consider a demand impartially.

77. Adams is not independent. Per the Company's Form 8-K filed March 20, 2026, Adams served as the Company's Chief Growth Officer until March 16, 2026, when, on the same day Limbers resigned, the board appointed him a director; he resigned his officer position that day, assumed the chairmanship previously held by Jones, and serves on no committee of the board.

31

Under Nasdaq Listing Rule 5605(a)(2), a person employed by the company within the prior three years is not independent, and Adams will not satisfy that standard until 2029. A chairman who was a member of Jones's management team three weeks before the corrective disclosures at issue, who owes his board seat and chairmanship to the very board reshuffle that followed the challenged conduct, and who sits on no committee capable of independent action, cannot impartially consider a demand to investigate and sue the chief executive he served under weeks earlier.

78.  Accordingly, none of the five members of the current board, and a fortiori no majority of it, could exercise independent and disinterested judgment respecting a demand, and demand is excused. The conduct challenged in Counts VI through VIII occurred while TruGolf was a Delaware corporation and is governed by Delaware fiduciary law; demand futility is pleaded under the law of Nevada, the Company's state of incorporation at filing, and the result is the same under the analogous Delaware framework.

79.  The wrongs complained of derivatively caused injury to the Company itself, including: issuance of equity at successive ratcheted discounts far below fair value; a $6,135,160 loss on extinguishment in fiscal 2025; $4,693,111 of preferred dividends converted into dilutive Class A shares; the costs of two reverse splits, Nasdaq hearings-panel proceedings, and the Mandatory Panel Monitor; exposure to expedited delisting; and the destruction of the Company's capacity to raise equity capital on conventional terms.

## COUNT I

### Violation of Section 11 of the Securities Act, 15 U.S.C. § 77k

### *(Class Plaintiff, Against TruGolf, Jones, Limbers, Polanen, Russell, Redmer, and Haynie)*

80. Class Plaintiff repeats and realleges the foregoing paragraphs as if fully set forth herein, except that, for purposes of this Count, Class Plaintiff expressly excludes and disclaims

any allegation that could be construed as alleging fraud or intentional or reckless misconduct. This Count is based solely on strict liability and negligence. The Signing Defendants for purposes of this Count are Jones, Limbers, Polanen, Russell, and Redmer, each of whom signed both the S-1 Registration Statement (June 20, 2025) and the S-3 Registration Statement (signed November 17, 2025, filed November 18, 2025) and was a director (or, as to Jones, an officer-director) at the effective date of each.

81. The Registration Statements, when they became effective, contained untrue statements of material fact and omitted material facts required to be stated therein or necessary to make the statements therein not misleading, as alleged in Section IV.H above.

82. TruGolf is the issuer of the securities registered under the Registration Statements and is strictly liable. Jones and the other Signing Defendants signed the Registration Statements or were directors of the Company at the times of effectiveness. Haynie consented to the inclusion of its audit reports in the Registration Statements and is liable with respect to the expertised portions thereof. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statements were true and complete: the most elementary such investigation, counting the Company's own shares, was demonstrably not performed, as the Company's April 17, 2026 correction admits.

83. Class Plaintiff and the members of the Class purchased Class A shares issued upon, or traceable to, the Registration Statements, without knowledge of the untruths and omissions, and were damaged thereby. This action is brought within one year after the discovery of the untrue statements and omissions, and within three years after the effective dates of the Registration Statements.

33

## COUNT II

### Violation of Section 15 of the Securities Act, 15 U.S.C. § 77o

#### *(Class Plaintiff, Against Jones)*

84.  Class Plaintiff repeats and realleges the allegations of Count I. Jones, by reason of his positions as Chief Executive Officer, President, director, and interim principal financial and accounting officer, his signatures on the Registration Statements, and his voting power, possessed the power and authority to control the contents of the Registration Statements and the conduct of the Company's affairs, and was a control person of TruGolf within the meaning of Section 15 of the Securities Act. Jones is liable jointly and severally with, and to the same extent as, the Company.

## COUNT III

### Violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9

#### *(Class Plaintiff, Against TruGolf, Jones, and the Director Defendants)*

85.  Class Plaintiff repeats and realleges the foregoing paragraphs, except that, for purposes of this Count, Class Plaintiff expressly excludes and disclaims any allegation of fraud or intentional or reckless misconduct. This Count is based on negligence; it does not sound in fraud.

86.  The Proxy Statements soliciting the May 30, 2025 approvals and the February 17, 2026 annual-meeting votes contained materially false and misleading statements and omitted material facts, as alleged in Section IV.H above, including subsection (e) thereof. Defendants prepared, reviewed, and disseminated the Proxy Statements negligently, without exercising the care required to ensure their accuracy and completeness.

87. As to the January 26, 2026 Proxy Statement, the misleading solicitation was an essential link in the accomplishment of the corporate actions approved at the February 17, 2026

34

annual meeting. Per the Company's Form 8-K filed February 18, 2026, as of the January 20, 2026 record date there were 4,857,445 Class A shares (one vote each) and 199,999 Class B shares (4,999,975 votes) outstanding, so the Class B holders commanded approximately 50.7% of total voting power. The outcomes certified at that meeting rested in substantial part on Class A votes solicited by the deficient Proxy Statement: Proposal 4, approving the Company's redomestication from Delaware to Nevada, carried 6,228,794 votes For, necessarily including at least 1,228,819 Class A For votes beyond the maximum possible Class B bloc, against 161,758 votes Against; and Proposal 5, increasing authorized Class A shares from 650,000,000 to 1,000,000,000, carried 6,148,384 votes For, necessarily including at least 1,148,409 Class A For votes. The redomestication approved through that solicitation became effective March 10, 2026 and extinguished the Delaware-law rights and remedies of the Class A holders, including inspection rights under 8 Del. C. § 220 and Delaware fiduciary remedies as to future conduct, and the share-increase approval enabled the continued issuance whose dilutive operation is alleged herein. The solicitation of Class A votes by a proxy statement that misstated the Company's capital structure was accordingly an essential link in corporate action that inflicted concrete, quantifiable loss on the Class.

88. As to the May 19, 2025 Proxy Statement, the essential-link requirement is satisfied notwithstanding the Class B holders' 88.8% voting control, because the materially deficient disclosures caused the loss of otherwise available remedies: accurate disclosure of the scale, immediacy, and disparate consequences of the issuance being authorized "without regard to any limitations" would have permitted Class A holders to seek relief under state law before the authorization was exercised and the harm inflicted, including injunctive or other equitable relief against the conflicted-controller transaction, remedies that the deficient disclosure foreclosed. In

35

addition, the shareholder approval obtained through the deficient May 2025 solicitation is the same approval Defendants rely upon as authorization for, and ratification of, the challenged issuances; a vote procured by materially misleading disclosure cannot supply that authorization or effect that ratification, and the solicitation was accordingly an essential step in the transactions' claimed legitimacy.

89.  As a direct and proximate result of the materially misleading Proxy Statements, Class Plaintiff and the Class were damaged.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

### *(Class Plaintiff, Against TruGolf and Jones)*

90.  Class Plaintiff repeats and realleges the foregoing paragraphs. During the Class Period, TruGolf and Jones, directly and indirectly, by the use of means and instrumentalities of interstate commerce, made untrue statements of material fact and omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon purchasers of TRUG Class A shares, in violation of Section 10(b) and Rule 10b-5, as alleged in Sections IV.H through IV.J above.

91.  TruGolf and Jones acted with scienter, as alleged in Section IV.I. Class Plaintiff and the Class relied on the misstatements and omissions, directly or through the presumptions identified in Section V, and suffered damages proximately caused thereby, as alleged in Section IV.J.

## COUNT V

## Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)

### *(Class Plaintiff, Against Jones)*

92.  Class Plaintiff repeats and realleges the allegations of Count IV. Jones was a control person of TruGolf within the meaning of Section 20(a) of the Exchange Act and, through his positions, signatures, certifications, and voting power, culpably participated in the violations alleged in Count IV, and is liable jointly and severally with, and to the same extent as, the Company.

## COUNT VI

## Breach of Fiduciary Duty (Delaware Law)

### *(Derivative Plaintiff, on behalf of TruGolf, and Class Plaintiff, Against Jones and the Director Defendants)*

93.  Plaintiffs repeat and reallege the foregoing paragraphs. At all times relevant to this Count, TruGolf was a Delaware corporation, and the conduct alleged is governed by Delaware law.

94.  Jones and the Director Defendants owed the Company and its stockholders fiduciary duties of care and loyalty, including the duties of candor and oversight. They breached those duties by approving, implementing, and maintaining the Series A Preferred financing on terms whose foreseeable operation transferred the Company's equity value to the preferred holders while insiders retained control through super-voting shares; by causing the enabling shareholder approvals to be solicited by materially deficient disclosures; by failing to implement and oversee controls adequate to track and disclose the Company's own capital structure, a failure admitted by

the Company's April 17, 2026 corrective amendment; and by knowingly exposing the Company to expedited delisting.

95.  The challenged transactions are alleged to be conflicted-controller transactions subject to entire-fairness review. At the operative vote, the Class B holders, including Jones, collectively commanded approximately 88.8% of TruGolf's voting power and used those votes to authorize effectively unlimited Class A issuance. The economic and voting consequences did not fall equally: public Class A holders absorbed the immediate price destruction, repeated reverse splits, and delisting risk, while Class B holders retained disproportionate voting leverage, and Jones separately retained a $2.25 million direct and indirect creditor position with demonstrated debt-exchange precedent. None of the procedural protections capable of cleansing a conflicted transaction was employed: no independent special committee with genuine bargaining authority approved the Series A structure, no majority-of-the-minority condition protected disinterested Class A holders, and the proxy disclosures were materially deficient for the reasons alleged above. The transactions were not entirely fair to the Company or its Class A stockholders, and no exculpatory charter provision or statutory safe harbor is available as to the loyalty, good-faith, and candor breaches alleged.

96.  As a direct and proximate result of these breaches, the Company has been damaged, and, as to the disclosure-based breaches, the Class has been damaged. To the extent any post-March 10, 2026 conduct is governed by Nevada law, the same conduct violated the duties owed by directors and officers under NRS 78.138, because it involved intentional misconduct or a knowing violation of law within the meaning of NRS 78.138(7), and liability is asserted under Nevada law in the alternative as to that conduct.

38

**COUNT VII**

**Aiding and Abetting Breach of Fiduciary Duty (Delaware Law)**

*(Derivative Plaintiff, on behalf of TruGolf, Against the ATW Defendants)*

97. Derivative Plaintiff repeats and realleges the foregoing paragraphs. A fiduciary relationship existed between the Company and its stockholders, on the one hand, and Jones and the Director Defendants, on the other, and those fiduciaries breached their duties as alleged in Count VI.

98. The ATW Defendants knowingly participated in those breaches within the meaning of Delaware law, which requires, and Plaintiff here pleads with particularity, actual knowledge. *See In re Mindbody, Inc. Stockholder Litigation*, 332 A.3d 349 (Del. 2024). The ATW Defendants did not merely accept favorable terms at arm's length: they negotiated and structured the ratcheting conversion, Alternate Conversion Price, reset, blocker, and exchange-cap mechanics of the Certificate of Designations whose foreseeable operation constituted the substance of the breach, and they were the counterparties to the Exchange Agreements the conflicted board approved.

99. The ATW Defendants' actual knowledge of the structure's operation and consequences is further established by their repeated prior deployment of substantially similar convertible structures at other Nasdaq-listed small-capitalization issuers, in each case pairing convertible instruments with sub-10% beneficial-ownership blockers and Schedule 13G passive-ownership filings: among others, ECD Automotive Design, Inc. (Schedule 13G filed December 22, 2023), Workhorse Group Inc. (Schedule 13G filed September 13, 2024), Freight Technologies, Inc., formerly Hudson Capital Inc. (Schedule 13G filings of October 7, 2021 and May 24, 2024), and NewGenIvf Group Ltd (Schedule 13G filed October 10, 2024), as reflected in filings with the SEC, and at Bit Origin Ltd, whose Form F-3 filed August 13, 2024 discloses a wholly owned

39

special purpose vehicle of the same Fund. The ATW Defendants' own filings further establish that these deployments are not passive investments but purpose-built structures: for each target, the Fund forms a dedicated Delaware special purpose vehicle named for that issuer, including Horsepower Opportunities LLC for Workhorse Group, Defender SPV LLC for ECD Automotive Design (whose business is the restoration of Land Rover Defender vehicles), ATW Digital Asset Opportunities LLC for Bit Origin, the serialized JAK Opportunities VI LLC for NewGenIvf, and, for TruGolf, SandTrap Opportunities LLC. Having repeatedly operated the same machine, the ATW Defendants knew precisely what it would do to TruGolf's Class A holders and to TruGolf itself, knew that the board's approval of those terms was procured through the insiders' super-voting control and materially deficient disclosure, and knowingly exploited the resulting breach for profit through continuous conversion and resale at successive ratcheted discounts.

100. As a direct and proximate result, the Company was damaged, and the ATW Defendants are jointly and severally liable for those damages.

**COUNT VIII**

**Unjust Enrichment (In the Alternative)**

***(Derivative Plaintiff, on behalf of TruGolf, Against the ATW Defendants and Jones)***

101. Derivative Plaintiff repeats and realleges the foregoing paragraphs. This Count is pleaded in the alternative pursuant to Fed. R. Civ. P. 8(d)(2), to the extent any express contract is held not to govern the benefits at issue or is held invalid, rescinded, or unenforceable.

102. The ATW Defendants and Jones were enriched, through conversion profits, dividends-in-kind, five-year dividend Make-Whole Amounts delivered in discounted stock, make-whole interest conversions, Default Rate accruals to the extent applicable, extinguishment gains, and retained control benefits, at the expense and to the impoverishment of the Company; the

enrichment and the impoverishment are directly related; no adequate justification exists for the retention of benefits obtained through breaches of fiduciary duty; and no adequate remedy at law exists to the extent the express contracts do not reach the benefits alleged. *See Certified Fire Protection, Inc. v. Precision Construction, Inc.*, 128 Nev. 371, 283 P.3d 250 (2012). Equity requires disgorgement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: (a) determining that this action is a proper class action under Fed. R. Civ. P. 23, certifying Class Plaintiff as class representative, and appointing Plaintiff's counsel as class counsel; (b) determining that the derivative counts are properly maintained under Fed. R. Civ. P. 23.1; (c) awarding compensatory damages against the Defendants named in Counts I through V, jointly and severally, in an amount to be proven at trial, together with prejudgment interest; (d) awarding rescission or a rescissory measure of damages on Count I to the extent available; (e) awarding damages to the Company on Counts VI through VIII, including disgorgement of all profits, benefits, and unjust enrichment obtained by Defendants; (f) directing reform of the Company's governance and controls, including its capital-structure and share-count reporting controls, the composition and independence of board committees approving related-party financings, and its disclosure controls and procedures; (g) awarding Plaintiff and the Class their costs and expenses of this action, including reasonable attorneys' fees and experts' fees, as permitted by law, including Fed. R. Civ. P. 23(h) and the common-benefit doctrine; and (h) granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all claims so triable.

DATED July 24, 2026.

PARSONS BEHLE & LATIMER

/s/ Erik A. Christiansen

Erik A. Christiansen

SCHWARTZ & ASSOCIATES, P.C.

/s/ Louis C. Schwartz

Louis C. Schwartz
(*pro hac vice* application forthcoming)

*Attorneys for Plaintiff*